Ok, our last case for argument, Stoughton Lumber v. Sveum, Mr. Payton. Excuse me. We are pleased to court Tim Payton appearing on behalf of Peter Sveum, the defendant appellate in this matter. Everybody knows that. Everybody knows that. The Bankruptcy Court, in making his decision, stated that Peter Sveum, or excuse me, that the trust provisions of Wisconsin's Theft by Contractor Statute. I believe the holding is erroneous. I don't think it's clearly erroneous that there's nothing in the record that would support such a finding. Both Peter and his brother Phil Sveum testified they were unaware of the trust provisions of the Theft by Contractor Statute. The President of Stoughton Lumber, James Gerber, he testified to his knowledge and his beliefs, but he was not an expert and could not testify about general things. And it's also interesting that he testified that he believed that people in the industry would have a general knowledge of the statute. And this statute is 20 pages of fine print, has about 98 subsections. There were 36 pre-litigation exhibits entered in this case, which took about a day to try, and not one of those exhibits references a trust or a fiduciary duty of anybody's part. Upholding this decision, in many ways, would have an ipso facto effect. He did sign falsely an owner's affidavit swearing that all the bills or obligations incurred in connection with said improvements, including the construction or repair thereof, have been paid in full. That he understood, didn't he? That's not the statute. No, that's not the statute, Your Honor. Right. And they had not been paid in full. No, they had not. Okay, so there's a basis then for the court to determine that it didn't believe him and wasn't buying what he was selling. But that owner's affidavit was drafted by the title company who supplied the two Mr. Spheme, many times supplying the Mr. Spheme documents in blank. They were not supplied to Stoughton Lumber to anybody else, for that matter. And it's actually for a different purpose altogether. It has nothing to do with the trust provisions in that statute. Now, that statute is really entitled liens. It really directs most of it, almost the vast majority of it, directs itself to liens under law. Construction liens, mechanics liens, things of that sort. But there was other evidence to obtain payments for houses built with materials supplied by Stoughton Lumber. He submitted draw requests to a financial institution itemizing amounts due to the lumber company. That's correct, Your Honor. Those, again, were drafted by personnel in his office, and they were not – those are a means to get the funds. You're correct. And you're correct. They're submitted oftentimes through a title company, but not always, to get the funds from the mortgage or, I guess, mortgagee, excuse me, the bank. They're used to show that the progress is going on. Now, you could read that to say that, well, I know those exact funds are going to be used to pay these exact things. But for 40 years, Peter Spheam did this the same way all the time, put it in a general operating account. That's why his father did it the same way, was put in a general operating account, and he paid the bills. And interesting enough, and up until I think it was August 2009, he did this practice dealing with Stoughton Lumber. He'd be paying Stoughton Lumber by invoices submitted by Stoughton Lumber. And it wouldn't be a correlation between a draw request and what was being paid. There was no showing that whatsoever. So I think they really are different purposes. And it's important because the Bank of Champaign case tells us that defalcation requires a state of mind, requires knowledge of the trust. It's not, and it's what they call criminal recklessness, I think it was called. It's not just mere negligence, even civil recklessness, a very high standard. You have to show that he knew the trust or was willfully blind to the trust. And it's troubling here is that the Bankruptcy Court's assertion that everybody knows that, everybody knows that. Haven't you taken away the requirement, the burden of proof that the plaintiff show that the defendant knew of the trust provisions or was willfully blind for that? You've eliminated that requirement altogether, have you not? And that's why I say, isn't this case of hell, aren't we going to have a situation where all you have to show is damages that you weren't paid and they received trust funds? Because there's no doubt that the statute creates a trust. There's no doubt that the defendant was the fiduciary. And there's no doubt that in this case, because he knew it, it's defalcation. And there was no requirement to show that. There was no requirement by Judge Martin. Now, it's hard to tell where his reasoning was coming from because he cites this fundamental construction law that everybody knows it and immediately follows it as an example of the draw request. And that's the troubling thing about the draw request. They're not used for the same purpose whatsoever. They have nothing to do with each other. Now, the plaintiff cites a number of things in his brief that, you know, documents or invoices were paid referencing. Now, there's one other thing, too. He admitted that he knew that Wisconsin had a theft by contractor law that could give rise to criminal prosecution. And he knew that because he was sued for theft by contractor. And then he did nothing to understand his obligations until more than a year and a half later. So he continued to submit documents, right? The record is not clear on that. I don't think that is the case. The record is not clear. But he was sued by this party. It was Stoughton 1. It was sued in Dane County. That was the first and only time he was sued under a theft by contractor liability. The original action was a contract against Kaganza Bows Incorporated. That was the business. And theft by contractor liability against Phil and Peter Sveem. And theft by contract, if you think what that's called, theft by contractor. And Mr. Sveem, Peter Sveem, stated that he wasn't concerned about that. And he never was concerned about that because he always, before this, before the market crash, he was always able to pay his bill and always had the intention to pay his bills. Usually when you think of theft, you think of doing things intentionally to deprive someone of their property. You think of, in the construction industry, you probably think of like the traveling salesmen that come into elderly people and do their driveway and get money from them never intending to do it. Those are the kind of things that you see in the paper normally. I think it's a little bit of a different thing to say, well, he didn't do anything. First of all, like I said, I don't think the record is real clear that he continued to do anything. By then they were liquidating their inventory. The way that they were going to get the Stoughton Lumber paid was to reduce the amount of inventory they had. And Stoughton Lumber was getting reports on what they were doing. Stoughton Lumber was getting half the profits, if I remember correctly. So they were in more of a wind-down thing, trying to get the people paid their old money during the crash. Okay. Thank you, Mr. Payton. Ms. West? May it please the Court. My name is Erin West, and I represent Stoughton Lumber Company. I would first like to address a question that Judge Williams had asked regarding Mr. Sveum's knowledge of the theft-by-contractor law in Wisconsin. His testimony at the trial and in an affidavit that had been submitted on summary judgment was that he generally understood that Wisconsin had this law called theft-by-contractor, and that his understanding of the law during the over 40 years that he operated as a contractor in Wisconsin was that criminal penalties could result for failing to pay subcontractors. Now, Mr. Sveum also testified that he was sued in 2011 by my client, by Stoughton Lumber, and he submitted an affidavit that stated that it was not until a year and a half after he had been sued for theft-by-contractor that he actually at that time took the time, set aside some time to understand what he was sued for and what the theft-by-contractor law required, and he claims that it was only at that time that he understood there was a trust fund provision to the law. But he did claim that he was operating as a contractor in Wisconsin for 40 years and that he had a general understanding that there was a theft-by-contractor law, yet did nothing to avail himself of knowledge of what those requirements were under the law. Mr. Sveum obtained half a million dollars that he knew he needed to pay to Stoughton Lumber, but he didn't pay that money to Stoughton Lumber. Instead, he diverted it for other purposes, and then he filed bankruptcy and tried to discharge the debt that he owed to Stoughton Lumber so that he would never have to pay Stoughton Lumber this half million dollars. The bankruptcy court correctly found that Mr. Sveum's actions in this regard, his failure to pay the $500,000 to Stoughton Lumber that he held for that purpose, that this constituted defalcation while acting in a fiduciary capacity, which is an exception to the bankruptcy discharge. The bankruptcy court's determination was supported by the evidence. It is entitled to deference, and it should be upheld by this court. Should we be concerned by the fact that the only person who testified that the requirements of the Wisconsin statute were common knowledge is the president of Stoughton Lumber, and therefore somebody with a very strong personal stake and, dare I say, bias with respect to the outcome of the litigation? Judge Wood, although that was the only direct testimony about the general knowledge of the theft by contractor statute, there is a litany of other evidence that exists in the record and that the bankruptcy judge reviewed in determining that Mr. Sveum did, in fact, have a knowledge and have an understanding of what the statutory requirements were and that he had to hold these funds in trust. And does that go beyond just the fact that he was in the industry for 40 years and the things that have already been mentioned? Is there additional evidence? There is a listing at page 14 to 16 of the red brief, of Appley's brief, but to summarize some of those points, when he obtained the money, the draw requests from the bank, as Judge Williams has identified, he submitted specific requests that showed that these funds were going to be earmarked to pay certain bills that were incurred on the homes that were being constructed. And those draw requests, Mr. Sveum testified he either signed himself or had one of his employees submit to the bank, but those specifically showed that the funds were going to be used to pay Stoughton Lumber. Mr. Sveum testified at trial that he understood that the bank expected that he would use those funds to pay Stoughton Lumber. He failed to do so. In addition, the record also shows that Mr. Sveum would submit these false affidavits, and he admitted that they were false, that he did nothing to actually determine whether the subcontractors and material suppliers had been paid. And he submitted these false affidavits because he knew that the only way to close on the sale of these homes was to submit these affidavits, and that's how he was going to get paid on the construction of the homes. So it begs the question, why would somebody intentionally perjure themselves to obtain money if they didn't think they needed to perjure themselves to obtain money? Clearly, Mr. Sveum knew that there was a reason behind all of this stuff that was occurring. He knew that he had these funds for a specific purpose, and he knew that he needed to pay Stoughton Lumber, and he believed he would apparently incur criminal penalties and criminal liability if he failed to pay Stoughton Lumber. Yet he did not. Has there been a criminal investigation or prosecution? There has not, Your Honor. Historically, in the area where this occurred, it's not a very frequently prosecuted crime. I think there are bigger fish to fry. But it does constitute a felony any time that there is over $2,500 of funds that are trust funds that are misappropriated in the theft by contractor statute or theft by contractor scene that does create a felony. But it is often left to parties such as Stoughton Lumber to pursue these general contractors in civil court in order to attempt to recover their funds that were misappropriated. Essentially, Mr. Sveum argues in this case that the court needs to interpret the U.S. Supreme Court's decision in Bullock v. Bank Champaign to require some new, additional, implicit element to the defalcation analysis, and that would be to require the debtor to actually admit that they knew they had to hold the funds in trust and admit that they failed to do so. But that is an incorrect interpretation of what the law requires, and in fact it's not really the question that is even before this court. The court doesn't need to decide whether someone can have committed defalcation if they didn't understand their fiduciary requirements, because here there is so much evidence that Mr. Sveum, notwithstanding his own professions of innocence, there is so much evidence that he did understand that he had a fiduciary obligation and that he had the knowledge that is required and acted with the intent that is required for defalcation to be shown. The bankruptcy court made this factual determination, and it weighed in part Mr. Sveum's credibility based on things such as his false affidavits that he admitted he had submitted, also his claims that he did not do anything to understand the theft by contractor law until a year and a half after he had been sued for violating that law. But Mr. Sveum here today bears the burden to show that the bankruptcy court's factual determinations were clearly erroneous, and that burden has not been carried. Mr. Sveum has compared himself, and in the briefs, is compared to an innocent or non-professional trustee like that in the Bullock v. Bank Champagne case, or Mr. Sveum has also compared himself to the one-off sole proprietor who picked up a case of shingles and has them in the back of his pickup truck going to fix his neighbor's roof. But neither of those are really apt characterizations of what Mr. Sveum was. In fact, Mr. Sveum is better described as a real estate tycoon in the south-central Wisconsin area. He operated for 40 years with his father and his brothers in multiple facets of the real estate construction industry. He was building hundreds of homes each year. In addition to his real estate construction business, which he operated for 20 years as the owner and operator, he also had a real estate agency. He was a licensed real estate agent. He had a real estate brokerage. He was a licensed broker, and he also had the title company that did the closing of all of these sales, the ones that he was submitting these false affidavits to. What was his title company that he was giving the phony affidavits to? That is correct, Judge. Well, he had everything covered. Yes, he did. Yes, he did. So from the other facets of his veritable real estate empire, Mr. Sveum testified that he knew and understood what a trust fund was. In fact, he testified that he had to maintain a trust fund in his title company business. He also testified that he knew and understood what a fiduciary obligation was, and Mr. Sveum was clearly a very sophisticated businessman. The theft by contractor has been the law in Wisconsin with this trust fund requirement for over a century. Nearly half of that Mr. Sveum was operating. So on the record that is before the court, the bankruptcy judge clearly had much evidence that weighs in favor of finding that Mr. Sveum committed defalcation while acting in a fiduciary capacity, and we would ask that this court affirm that decision. Okay. Thank you, Ms. West. Mr. Payton, anything further? Thank you. Some points. Mr. Sveum did not own the title company. He owned a minority, a very small part of it. He didn't control it. There's nothing in the record that would say he controlled it. Mr. Sveum was not a tycoon. He was not a real estate tycoon. He was a struggling businessman. He wasn't sophisticated. A sophisticated businessman doesn't sign blank affidavits. These affidavits that were mentioned were signed, they were blank. There was nothing in them. They were notarized by the title company when they weren't even there, when they were signed. A sophisticated businessman does not do that. What was the annual income of his various businesses? I don't know. That was in the record. I don't know, Your Honor. What she represented, though, was he a real estate broker? Did he own? The brothers owned, yes, he has a real estate license, and he was well aware of the trust provisions in association with having escrow accounts as a realtor, and he also testified that he understood the significance of that and the punishment involved with violating that trust. He was well aware of a trust. Is it correct that he built hundreds of houses a year? Not a year, over the years, not a year, no. He only built a few hundred. How many houses did he build in total in his career? The record would say hundreds in total in his career. And, actually, I think the record would say from 1989, Kaganza Builders Incorporated, his business that he owned with his brother, built hundreds of houses while that was in operation. I don't think the record says how many houses were being built in a year. I would just really quickly would like to note that Mr. Steem testified he understood that it was a violation of the theft by contractor statute to fail to pay a bill and intend to fail to pay the bill. And I think it's significant, and he repeatedly said that. He never tried to hide that. He did not divert money from this company. Matter of fact, him and his brother invested over half a million dollars from related companies into the Kaganza Builders. Are you saying he didn't understand the law? I don't believe that Mr. Steem knew that there was a trust provision contained in Wisconsin's lien law, which is where the theft by contractor statute is buried, yes. I don't know if you can use the ignorance of law to excuse you from a claim of fraud. This is a defalcation, I think, under the Bank of Champaign Bullock case. It is significant. Matter of fact, it's interesting because Judge Martin, the bankruptcy judge here, has ruled previously, about 15, 20 years ago, that knowledge of the trust provisions is material. He had knowledge of the trust, which kind of is contradictory to the assertion that all general contractors know that. If I could just have one moment. Okay. Mr. Steem invested over $200,000 from his retirement account into this business to keep it afloat, to try to get everything paid. He didn't perjure himself. Those documents that were signed and notarized, they weren't notarized. He signed them blank, and someone else filled them out and notarized them. That someone else was the title company who was supplying them. Again, there were no false affidavits. I mean, the affidavits were filled out blank half the time. So I don't know that they really constituted an affidavit. That Bullock case that you cited says that you need the intentional wrong, and when it's defined intentional wrong, knowledge over gross recklessness in respect to and the improper nature of the relevant fiduciary duty. It further says actual knowledge of wrongdoing is not necessary to establish such intent. The requirement is met when the fiduciary consciously disregards or is willfully blind to a substantial risk. That's correct. And to determine if someone's willfully blind, you have to find out what that person knew and what that person was asking about. If you're in business, you have to know the law applicable to the business. You can't close your eyes to that, and then when you commit various illegal acts, say, well, it wasn't fraud because I just didn't know the law. I was too busy to learn anything about the law. That doesn't sound right to me. First of all, I don't think it's illegal. It may be unlawful. There is no requirement in the state of Wisconsin to you can just go sign up and get your builder's license. You don't need to take any courses. There's nothing you have to do. You just go start doing it. Look, if you're in business, you can't say to yourself, well, I'm in business. I'm not a lawyer, so I don't care what the law is. I'll take my chances. If I go broke, fine. I go broke, but I get a discharge, right? No, you can't do that. I'm not sure I understand that. Well, it should be pretty clear. That is, you can't save your discharge by deliberately refusing to acquaint yourself with the law so that if you violate the law, you'll say, well, it's not fraud because I don't know the law. I would agree with you. Okay, fine. Okay, well, thank you very much to both counsel. And that concludes our morning of arguments. I do so take these cases under advisement. We'll be in recess.